IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| MARCIA D. BAZILE-FLAKE, | § | |
|     Plaintiff, | § | |
| | § | |
| vs. | § | CIVIL ACTION NO. H-04-4707 |
| | § | |
| JO ANNE B. BARNHART, | § | |
| Commissioner, Social | § | |
| Security Administration, | § | |
|     Defendant. | § | |

**MEMORANDUM AND RECOMMENDATION ON
CROSS-MOTIONS FOR SUMMARY JUDGMENT**

This matter was referred by United States District Judge Lee H. Rosenthal, for full pre-trial management, under 28 U.S.C. § 636(b)(1)(A) and (B). (Docket Entry # 3). Before the court are competing motions for summary judgment which were filed by Plaintiff Marcia D. Bazile-Flake ("Plaintiff," "Bazile-Flake") and Defendant Jo Anne B. Barnhart, in her capacity as Commissioner of the Social Security Administration ("Defendant," "the Commissioner"). (Motion For Summary Judgment ["Plaintiff's Motion"], Docket Entry # 19; Brief ["Plaintiff's Brief"], Docket Entry # 14; The Commissioner's Motion For Summary Judgment ["Defendant's Motion"], Docket Entry # 16; Defendant's Memorandum in Support of Motion for Summary Judgment ["Defendant's Memorandum"], Docket Entry # 17). Plaintiff has responded in opposition to Defendant's motion. (Plaintiff's Opposition to Defendant's Cross Motion for Summary Judgment ["Plaintiff's Response"], Docket Entry # 18). After considering the motions, the evidence submitted, and the applicable law, it is RECOMMENDED that Plaintiff's motion for remand be **GRANTED**, and that Defendant's motion be **DENIED**. The matter should be remanded, under the fourth sentence of 42 U.S.C. §

1

405(g), so that the administrative law judge may properly develop the record further, under the governing regulations, to reconcile  any conflicts or ambiguities  in the medical opinions, to determine Plaintiff's actual limitations and residual functional capacity, as well as, if necessary, her ability to maintain employment.

**Background**

Bazile-Flake filed this lawsuit, pursuant to § 205(g) of the Social Security Act ("the Act") (codified as amended at 42 U.S.C. § 405(g)(1994)), on June 22, 2004.  (Complaint ["Complaint"], Docket Entry # 1).  In this action, she appeals the Commissioner's decision to deny her claim for Disability Insurance Benefits ("DIB") under Title II of the Act.  (*Id.*).  Bazile-Flake asks the court to reverse that decision, and to render a judgment in her favor, or, alternatively, to remand it for further consideration.  Before this court, Bazile-Flake argues that the Administrative Law Judge ("ALJ") made improper and irrelevant findings on her residual functional capacity, which lead him to an ultimately erroneous determination of her disability. (Plaintiff's Brief at 16).  She contends that, because he failed to appreciate the "essence" of her impairment, he made improper credibility findings on her subjective complaints.  And, she claims, this error led him to give diminished weight to her treating physician's opinion and allowed him to avoid a consideration of, and findings on, whether her impairment allows her to "maintain" employment even if she is able to acquire it.  (*Id.* at 21).  Defendant insists, however, that the ALJ followed all of the proper procedures in evaluating the evidence, and that his decision is substantially supported by the record.  (Defendant's Memorandum at 1).  For those reasons, she maintains that the ALJ's decision is not subject to remand or reversal.

Plaintiff filed an application for DIB benefits on November 21, 2001. (Tr. at 50).  In a "Disability Report" that she completed for the Social Security Administration ("SSA"), she claimed that she had been unable to work since June 11, 2001, because of her chronic fatigue syndrome.  (*Id.* at 60).  The SSA denied Bazile-Flake's request for benefits on  March 14, 2002.  (Tr. at 21).  Two months later, she asked the SSA to reconsider that decision.  (Tr. at 26).  On June 19, 2002, the SSA again evaluated the medical evidence she had submitted with her application, along with more recent medical reports from her treating physician. (Tr. at 27, 30).  The agency concluded that the determination to deny her claim was "proper under the law." (*Id.*).  She then requested a hearing before an ALJ.  (Tr. at 31).

On June 17, 2003, ALJ Jack W. Raines reviewed Bazile-Flake's claims de novo.  Bazile-Flake was accompanied by an advocate at a hearing scheduled before the ALJ, and she testified in her own behalf. (Tr. at 228).  The ALJ also heard from Caroline Fisher, a vocational expert witness.  (*Id.*).  In addition to the testimony, the ALJ reviewed medical records from two of  Plaintiff's treating physicians, Dr. Patricia Salvato and Dr. Dipti Bavishi.  (Tr. at 90-152, 153-160, 210-221).  The ALJ also had the benefit of a physical residual capacity assessment, based on a review of Plaintiff's medical records, that had been completed by Dr. Jan Moeller, on behalf of the SSA; the report of a medical examination performed by Dr. Ana Blackmon; and a psychiatric evaluation from Dr.  Amina Abdulla.   These last two examinations and reports were done at the request of the Texas Rehabilitation Commission, Disability Determination Services ("DDS").  (Tr. at 162-67, 168-73, 188-95).  The ALJ also had the results from  two other psychiatric reviews, which were based only on Plaintiff's records. These were completed by Dr. Lyman G. Phillips and Dr. Farrell A. Hillman, on behalf of the SSA. (Tr. at 174-87, 196-209).

Following the hearing, the ALJ engaged in the following five-step, sequential analysis to determine whether Plaintiff was capable of performing substantial gainful activity or was, in fact, disabled:

1.  An individual who is working or engaging in substantial gainful activity will not be found disabled regardless of the medical findings. 20 C.F.R. §§ 404.1520(b) and 416.920(b).

2.  An individual who does not have a "severe impairment" will not be found to be disabled. 20 C.F.R. §§ 404.1520(c) and 416.920(c).

3.  An individual who "meets or equals a listed impairment in Appendix 1" of the regulations will not be considered disabled without consideration of vocational factors. 20C.F.R. §§ 404.1520(d) and 416.920(d).

4.  If an individual is capable of performing the work he has done in the past, a finding of "not disabled" must be made. 20 C.F.R. §§ 404.1520(e) and 416.920(e).

5.  If an individual's impairment precludes performance of his past work, then other factors, including age, education, past work experience, and residual functional capacity must be considered to determine if any work can be performed. 20 C.F.R. §§ 404.1520(f) and 416.920(f).

*Newton v. Apfel*, 209 F.3d 448, 453 (5th Cir. 2000); *Martinez v. Chater*, 64 F.3d 172, 173-74 (5th Cir. 1995); *Muse v. Sullivan*, 925 F.2d 785, 789 (5th Cir. 1991); *Wren v. Sullivan*, 925 F.2d 123, 125 (5th Cir. 1991); *Harrell v. Bowen*, 862 F.2d 471, 475 (5th Cir. 1988). It is well-settled that, under this analysis, Bazile-Flake has the burden to prove any disability that is relevant to the first four steps. *Wren*, 925 F.2 at 125; *Bowen v. Yuckert*, 482 U.S. 137, 146 n. 5 (1987). If she is successful, the burden then shifts to the Commissioner, at step five, to show that she is able to perform other work that exists in the national economy. *Myers v. Apfel,* 238 F.3d 617, 619 (5th Cir. 2001)*; Wren*, 925 F.2d at 125. "A finding that a claimant is disabled or is not disabled at any point in the five-step review is conclusive and terminates the analysis." *Lovelace v. Bowen*, 813 F.2d 55, 58 (5th Cir. 1987).

It must be emphasized that the mere presence of an impairment does not necessarily establish a disability. *Anthony v. Sullivan*, 954 F.2d 289, 293 (5th Cir. 1992)(quoting *Milam v. Bowen*, 782 F.2d 1284, 1286 (5th Cir. 1986)).  An individual claiming benefits under the Act has the burden to prove that she suffers from a disability. *Johnson v. Bowen*, 864 F.2d 340, 343 (5th Cir. 1988); *Cook v. Heckler*, 750 F.2d 391, 393 (5th Cir. 1985).  A claimant is deemed disabled, under the Act, only if she demonstrates an "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death, or which has lasted or can be expected to last for a continuous period of not less than twelve months." *Selders v. Sullivan*, 914 F.2d 614, 618 (5th Cir. 1990)(citing 42 U.S.C. § 423(d)(1)(A)).  Substantial gainful activity is defined as "work activity involving significant physical or mental abilities for pay or profit." *Newton*, 209 F.3d at 452.  A physical or mental impairment is "an impairment that results from anatomical, physiological or psychological abnormalities which are demonstrable by medically acceptable clinical and laboratory diagnostic techniques." *Hames v. Heckler*, 707 F.2d 162, 165 (5th Cir. 1983; 42 U.S.C. § 423(d)(3)).  Further, the impairment must be so severe as to limit the claimant so that "[she] is not only unable to do her previous work but cannot, considering her age, education, and work experience, engage in any kind of substantial gainful work which exists in the national economy." *Greenspan v. Shalala*, 38 F.3d 232, 236 (5th Cir. 1994); 42 U.S.C. § 423(d)(2)(A)).

On July 13, 2003, the ALJ issued a written decision denying Bazile-Flake's claim.  Based on the applicable legal principles, and his assessment of the evidence before him, he determined that Bazile-Flake suffers from chronic fatigue syndrome. (Tr. at 13).  Although he determined that her condition is "severe," he concluded, ultimately, that it does not meet, or equal in severity, the medical criteria for that or any other  impairment listed in the applicable Social Security Regulations.  (*Id.*).

5

He found further that Bazile-Flake has the residual functional capacity to perform a "wide range of work at the sedentary exertional level."  (Tr. at 16).  From those findings, the ALJ concluded that Bazile-Flake can return to her past work as a facility specialist or customer service representative. (*Id.*).  For that reason, the ALJ found that Bazile-Flake was "not under a 'disability' as defined in the Social Security Act," and her claim for benefits was denied. (*Id.*).

Following the written decision, Plaintiff asked the SSA Appeals Council ("Appeals Council") to review the ALJ's conclusion.  (Tr. at 8).  At the same time, Bazile-Flake submitted additional evidence that the Appeals Council agreed to consider.  This included a medical report, dated April 23, 2002, from her treating physician.  (Tr. at 226).  SSA regulations provide that the Appeals Council will grant a request for a review if any of the following circumstances are present: "(1) there is an apparent abuse of discretion by the ALJ; (2) an error of law has been made; (3) the ALJ's action, findings, or conclusions are not supported by substantial evidence; or (4) there is a broad policy issue which may affect the public interest."  20 C.F.R. §§ 404.970, 416.1470.  On September 30, 2004, after considering the applicable regulations, the evidence submitted, and Plaintiff's contentions, the Appeals Council concluded that there was "no reason" to grant Bazile-Flake's request for a review. (Tr. at 4).  Accordingly, the ALJ's findings became final, and it is that decision which Plaintiff has appealed to this court under 42 U.S.C. § 405(g).

**Standard of Review**

Federal courts review the Commissioner's denial of disability benefits only to ascertain whether the final decision is supported by substantial evidence and whether the Commissioner used proper legal standards to evaluate the evidence.  *Newton*, 209 F.3d at 452 (citing *Brown v. Apfel*, 192 F.3d 492, 496 (5th Cir. 1999)).  "If the Commissioner's findings are supported by substantial

evidence, they must be affirmed." *Id.* (citing *Martinez*, 64 F.3d at 173). "Substantial evidence is such relevant evidence as a reasonable mind might accept to support a conclusion. It is more than a mere scintilla and less than a preponderance." *Ripley v. Chater*, 67 F.3d 552, 555 (5th Cir. 1995); *Martinez*, 64 F.3d at 173 (quoting *Villa v. Sullivan*, 895 F.2d 1019, 1021-22 (5th Cir. 1990)). On review, the court does not "reweigh the evidence, but . . . only scrutinize[s] the record to determine whether it contains substantial evidence to support the Commissioner's decision." *Leggett v. Chater*, 67 F.3d 558, 564 (5th Cir. 1995); *Fraga v. Bowen*, 810 F.2d 1296, 1302 (5th Cir. 1987). If no credible evidentiary choices or medical findings exist that support the Commissioner's decision, then a finding of no substantial evidence is proper. *Johnson v. Bowen*, 864 F.2d 340, 343 (5th Cir. 1988).

**Discussion**

In this instance, the ALJ found that Bazile-Flake suffers from a "severe" impairment, but that her medical records contained none "of the necessary clinical signs or diagnostic findings which meet or equal the degree of severity" specified in the regulations for a "presumptive finding of disability." (Tr. at 13). He found further that, because Plaintiff can return to her former work as a facility specialist or a customer service representative, she is "not disabled" under the statute and guidelines. (*Id.* at 16-17). But Bazile-Flake argues here that the ALJ erred when he failed to give proper weight to the opinions from her treating physician, Dr. Salvato. (Plaintiff's Brief at 19). In particular, she complains that "the ALJ has dismissed the evidence of extreme fatigue" that Dr. Salvato chronicled, and that he did not follow the SSA guidelines applicable to chronic fatigue syndrome ("CFS"). Next, Plaintiff argues that the ALJ made irrelevant findings on her residual functional capacity, which lead him to an erroneous determination of her disability. (*Id.* at 16). She contends that, because he did not have full understanding of her impairment, he made prejudicial credibility findings on her

subjective complaints, which also colored the weight he gave to her treating physician's opinion and to his conclusions on her residual functional capacity. Finally, she claims that, in her case, the ALJ had an obligation to consider and make specific findings on whether she can maintain employment. (*Id.* at 21). In evaluating these arguments, the court's inquiry is limited to a determination of whether there is substantial evidence in the record to support the ALJ's findings and whether the proper legal standards were applied. *Myers v. Apfel,* 238 F.3d 617, 619 (5th Cir. 2001) (citing *Greenspan v. Shalala,* 38 F.3d 232, 236 (5th Cir. 1994)). To do so, the court must weigh the following four factors: the objective medical facts; the diagnoses and opinions from treating physicians on subsidiary questions of fact; Plaintiff's own testimony about pain; and Plaintiff's educational background, work history, and present age. *Wren v. Sullivan*, 925 F.2d 123, 126 (5th Cir. 1991). Any conflict in the evidence is to be resolved by the ALJ and not the court. *Newton*, 209 F.3d at 452.

### 1. Objective Medical Facts

Here, Plaintiff claims that she became disabled on June 11, 2001, due to the severity of symptoms accompanying her chronic fatigue syndrome. The earliest medical evidence is from March 25, 1999, when she was referred to Dr. Dipti Bavishi for a "stress test," as a result of her complaint of chest pains. (Tr. at 154-56). Although the test was not completed, "because of [Plaintiff's] fatigue," it did show a "[n]ormal ECG at 'inadequate' heart rate of 128 (70%)." (Tr. at 154, 156). On January 16, 2001, Bazile-Flake was seen by her treating physician, Dr. Patricia Salvato. (Tr. at 147-48). It is apparent from the record that Plaintiff had begun treatment with this doctor much earlier, but Dr. Salvato's treatment notes date only from January of 2001, through April 2003. In any event, at the office visit on January 16, Bazile-Flake reported "improved headaches, persistent muscle aches and joint aches," weakness, and fatigue, although she "[d]enie[d] major fatigue." (*Id.*).

Dr. Salvato charted a number of other characteristics that day, as well, including weight gain, swollen glands, muscular pain, joint pain, a temperature of 97.8, and the fact that Plaintiff displayed tenderness at 11 out the 18 pertinent points tested. (Tr. at 147-48). Plaintiff was given an Epstein-Barr[1] early antigen test, and the results registered "a greater than 1:10 titer." (Tr. at 150). In Dr. Salvato's "assessment," Bazile-Flake was said to be suffering from "FM" [fibromyalgia].[2] (Tr. at 148). One month later, on February 16, 2001, Bazile-Flake told Dr. Salvato that she had "improved headaches, tiredness, sleep, muscle pain, joint pain and tingling." (Tr. at 145). She was taking ATP[3] injections to increase her energy, and she rated her level of fatigue at a 6 on a 10 point scale. (Tr. at 145). At this examination, Bazile-Flake again exhibited tenderness at 11 of 18 tender points. (Tr. at 146). Her temperature on that day was recorded as 98.3 degrees. (Tr. at 145). At that appointment, Dr. Salvato's "assessment" was that Plaintiff suffered from both fibromyalgia and "fatigue." (Tr. at 145). Two weeks later, Bazile-Flake returned to Dr. Salvato's office, complaining of chest pain, a runny nose, itchy eyes, sneezing and a cough. (Tr. at 143). Her temperature on that day was noted

---

[1] The Epstein-Barr virus "resides in the salivary glands, is transmitted with saliva, and symptomatically reactivates from time to time." "[B]y 40 years of age[,] 99% of the U.S. population has serologic evidence of EBV infection." *Mosby's Dictionary, Medical, Nursing, and Allied Health* 579 (5th ed. 1998). An early antigen test which shows an elevated antibody titer of "1:640 or greater" is sufficient to "establish the existence of a medically determinable impairment in individuals with CFS." S.S.R. 99-2p,1999 WL 271569 (S.S.A.) At *3. A test result with a lower level, however, "should not be relied upon to the exclusion of all other clinical evidence in decisions regarding the presence and severity of a medically determinable impairment." *Id*. at *n.4.

[2] "A form of nonarticular rheumatism characterized by musculoskeletal pain, spasm and stiffness, fatigue, and severe sleep disturbance. Common sites of pain or stiffness can be palpated in the lower back, neck, shoulder region, arms hands, knees, hips, thighs, legs and feet. These are known as trigger points." *Id*. at 632. The American College of Rheumatology criteria for clinical diagnosis of fibromyalgia require "a history of a least three months of widespread pain, and pain and tenderness in at least 11 of 18 tender-point sites. These tender-point sites include fibrous tissue or muscles of the neck, shoulder, chest, rib cage, lower back, thighs, knees, arms (elbows), and buttocks. Unlike 'tender points,' 'trigger points' occur in isolation and can cause pain even without direct pressure." Wolfe, et al., *The American College of Rheumatology 1990 Criteria for the Classification of Fibromyalgia: Report of the Multicenter Criteria Committee*, 33 Arthritis & Rheumatism 160-72 (1990).

[3] Adenosine triphosphate (ATP) "serves to store energy in muscles." *Mosby's Dictionary, Medical, Nursing, and Allied Health* at 38.

to be 98.7.  (*Id.*).  At her next appointment, on March 30, 2001,  Plaintiff complained of  "persistent body aches, sleepiness," "fatigue" with "tingling in fingers" and shortness of breath.  (Tr. at 140). Her temperature was recorded at 98.6, and she rated her level of fatigue at an 8, on a scale of 10. (*Id.*).  Plaintiff told Dr. Salvato that the  ATP injections are "not much help."  The treatment notes from that day also record  Plaintiff 's continued complaint of tingling in her fingers, and the added complaint of  "memory changes."  (Tr. at 140).   On the next visit, April 27, 2001, Plaintiff still complained of "tingling in hands," "numbness" in her arms and hands, "joint pain" in her legs, "fatigue" and "body aches" including in her "elbows, ankles, knees," "thighs" and "wrists."  (Tr. at 138).  She said she experienced shortness of breath with exertion, and reported her fatigue level as a 9 on a 10 point scale.  (*Id.*).  Dr. Salvato made no notation as to "tender points"  at this examination, but  Plaintiff  again reported "memory changes."  (Tr. at 138-39).  Her temperature was recorded at 98.7 degrees.  (Tr. at 138).

The next month, at a visit on May 9, 2001, Bazile-Flake announced improvement to her "headaches, joint aches, tingling in hands, numbness and body aches," although her "persistent fatigue" remained, and she was still  "unable to sleep."  (Tr. at 136).  No tender points were charted at this appointment, and Bazile-Flake's temperature was recorded at 98.6 degrees.  (Tr. at 136-37). Again, memory changes were reported to her doctor.  (Tr. at 136).  On June 12, 2001, Plaintiff stated once more that she had "improved headaches, numbness, tingling in hands, chest pain," but she still had "persistent fatigue." She rated her fatigue at a 7 on a scale of 10. (Tr. at 132).  No tender points or temperature readings were noted at that exam.  (*Id.*).  However, the chart does record Plaintiff's continued complaints of  "muscular pain," "headache," "joint pain," "tingling," and "memory change."  (*Id.*).  At her next appointment, in August 2001,  Bazile-Flake reported "[p]ersistent SOB [and] tiredness," but improvement to her  "headaches, muscle aches, blurred vision," and "body

aches." (Tr. at 128).  On that day, she told Dr. Salvato that her shortness of breath ["SOB"], troubled her "with activity only."  (*Id.*).  Plaintiff rated her fatigue, on that date, as an 8 on a scale of 10, and her temperature was found to be normal  (*Id.*).  Two weeks later, Plaintiff underwent another stress test.  (Tr. at 158).  On that test, she achieved a "maximum heart rate of 147," which was deemed a "normal stress echo," but once again the test was terminated due to Bazile-Flake's fatigue.  (*Id.*). She next saw Dr. Salvato on September 13, 2001, and reported "improved headaches, body aches, fatigue and SOB."  (Tr. at 124).  She told her doctor, that although there had been improvement, the symptoms were "better but not resolved."(*Id.*).  Bazile-Flake rated her level of fatigue as 7 on a 10 point scale, on a typical day. (*Id.*).  At that visit, Dr. Salvato charted Plaintiff's complaints as "both muscle and joint pain," and again recorded tenderness at 11 of the 18 relevant tender points.  (Tr. at 124-25).  On that day, her temperature was noted to be 97.9 degrees.  (Tr. at 124).

On October 26, 2001, Plaintiff returned to Dr. Salvato complaining "of tiredness, body aches, loss of short term memory, blurred vision and chest pain," but reported "[n]o shortness of breath." (Tr 118).  She rated her fatigue level that day, as an 8 on a scale of 10.  (*Id.*).  No tender points were noted, but Plaintiff did report "tingling," "numbness," and "headaches." (Tr. at 118-19).  She had a temperature of 98.3 degrees.  (Tr. at 118).  At an appointment on January 25, 2002, Bazile-Flake remarked on "[i]mproved headaches and blurred vision," but still complained of "[p]ersistent body aches" and "fatigue."  (Tr. at 111).  She also complained of stomach pain that "comes and goes," a long-standing spot on her right hand, and "a lump behind [the left] ear." (*Id.*).  No tender points were noted, nor was shortness of breath or muscle and joint pain, but she again reported "numbness," "tingling," and "memory loss." (Tr. at 111-12).  Her temperature was recorded at 98.5 degrees. (Tr. at 111).  Three months later, on April 15, 2002, Bazile-Flake complained that she still had "[p]ersistent body aches, fatigue, and tingling," with "heaviness/numbness in [the] arms," which

occurred in "one or both arms." (Tr. at 104).  That day, she rated her level of fatigue as a 5 on a 10 point scale. (*Id.*).  Dr. Salvato noted  "[p]ersistent generalized muscle pain," and "post-exertion fatigue." (*Id.*). The treatment notes also detail Plaintiff's complaints of "headache," "numbness," and "memory change," but no tender points were recorded that day.  Her temperature was noted to be 97.5. (*Id.*).  On June 27, 2002,  Plaintiff told Dr. Salvato that  she had "improved fatigue, weakness, and body aches," and on that day, she reported her level of fatigue as 5 on a scale of 10. She also complained again of "memory change," "numbness," "tinging," "muscle" and "joint pain."  (Tr. at 99)  Her temperature was recorded at 96.1. (*Id.*).

Apparently, Bazile-Flake had no other visits to Dr. Salvato until October 2, 2002. On that day, she reported "improved body aches, numbness, headaches, and fatigue," and described her muscle pain as greater than the joint pain. (Tr. at 93). She also told the doctor that she had noticed losses in both concentration and her "ability to focus." (*Id.*). She rated her level of fatigue at about 6 on a scale of 10. (*Id.*). The musculoskeletal exam on that day revealed 12 tender points out of 18. (Tr. at 94). Bazile-Flake's temperature was 98.6 degrees. (Tr. at 93). Bazile-Flake returned to Dr. Salvato on December 16, 2002, and again reported "improved headaches" and "fatigue," but an increase to the body aches, tingling in her hands, and shortness of breath. (Tr. at 218). She also said that she had continued to have "[m]uscle and joint pain." (*Id.*). She rated her fatigue level at 7 out of 10 on that day. (*Id.*). Her temperature was recorded at 98.5 degrees. (*Id.*). The last appointment with Dr. Salvato that has been included in the administrative record is from April 1, 2003. On that day, Plaintiff reported "increased body aches," "fatigue," and "SOB," but improvement to her headaches. (Tr. at 212). Dr. Salvato noted that Bazile-Flake complained of "[r]apid weight gain" and a "sharp, piercing pain" in her chest. (*Id.*). Her temperature was noted to be 97.9 degrees. (*Id.*).

12

And again, at that office visit, the examination showed tenderness at 12 of the 18 tender points.  (Tr.
at 213).

## 2. *Opinions and Diagnoses*

In determining the sufficiency of the evidence to support an ALJ's decision, the court must
consider any diagnoses or expert opinions, from treating and examining physicians, on subsidiary
questions of fact.  "[O]rdinarily the opinions, diagnoses and medical evidence of a treating physician
who is familiar with the claimant's injuries, treatment, and responses should be accorded considerable
weight in determining disability."  *Scott v. Heckler*, 770 F.2d 482, 485 (5th Cir. 1985).  However, it
is the ALJ's duty, as fact finder, to determine the credibility of the medical reports and the testimony
from the claimant's treating doctors.  *Griego v. Sullivan*, 940 F.2d 942, 945 (5th Cir. 1991).  In this
instance, the ALJ reviewed the records and reports from Plaintiff's treating physician; reports from
two examining physicians, one a physical examination and the other a psychiatric examination; and
two other psychiatric reviews, which had been prepared by non-examining psychiatrists.

In February 2002, Dr. Ana Blackmon examined Bazile-Flake  on behalf of the DDS.  (Tr. at
162).  Plaintiff  reported to Dr. Blackmon that she began to have problems with fatigue in 2000, and
she "feels like she cannot do what she used  to do."  (*Id.*).  Dr. Blackmon  noted  that Plaintiff was
taking "Ultram for pain, Xanax for anxiety, and Ambien for insomnia," as well as  Aura ATP, and
Lipitor.  (Tr. at 162-63).  Plaintiff told Dr. Blackmon that "she is tired all the time," and "her entire
body  aches."   (*Id.*).   Dr. Blackmon  observed  that Bazile-Flake's  medical  history  reflected
"hyperlipidemia,[4] sinus problems, and anxiety."  (*Id.*). Following  her examination, Dr. Blackmon
observed that Bazile-Flake had  a  "full range of motion," with no tenderness or spasms in her back,

---

[4] Hyperlipidemia is "an excess of lipids . . . in the plasma."  *Id.* at 791.  Lipids are "any of the free fatty acid
fractions in the blood," including "cholesterol."  *Mosby's Dictionary, Medical, Nursing, and Allied Health* at 946.

and that "[h]er extremities are without edema," although some "fullness over the thyroid" was noted. (Tr. at 164). Dr. Blackmon found no signs of muscle atrophy or weakness, and that " her motor examination is 5/5," or normal. (*Id.*). She also found Plaintiff's gait and reflexes to be normal, as well. (*Id.*). In her "assessment," Dr. Blackmon stated that Plaintiff had been complaining of fatigue for two years, and "her primary physician has been managing this as fibromyalgia." (Tr. at 164). She then commented on Bazile-Flake's reported sleep disturbances and speculated that she may have a sleep disorder "or sleep apnea syndrome which may put together many of her symptoms." (Tr. at 165). Dr. Blackmon also suggested that "depression should be considered" as a diagnosis. (*Id.*). The report of a lumbar spine x-ray was attached to Dr. Blackmon's records. That report, dated February 18, 2002, showed an "[e]ssentially normal lumbar spine." (Tr. at 167). A chest x-ray from the same date also reported "[n]o abnormalities... ...on two views of the chest." (*Id.*).

In February 2002, Plaintiff was examined by Dr. Amina Adbulla, "for a psychiatric evaluation only... performed for the TRC / DDS." (Tr. at 168). Dr. Abdulla observed that Plaintiff appeared "very well dressed, well kempt and very well groomed." She reported that Plaintiff was "cooperative," "coherent, relevant, and logical." (Tr. at 170-71). Bazile-Flake told Dr. Abdulla that her chief complaints were "body aches, shortness of breath, and decreased energy." She told her that she had been diagnosed as suffering from chronic fatigue syndrome, which lead her to leave her job after 22 years, although she had planned to stay until her retirement, when she "reached 30 years of of service." (Tr. at 168). Bazile-Flake described herself as " being very healthy and states she had no problems and liked her job." Dr. Abdulla found Plaintiff to be "preoccupied by her physical symptoms," but found "no history of depression" or treatment for any previous medical problems. (Tr. at 169-70). Dr. Abdulla's report noted that Bazile-Flake had been diagnosed as having

"hypercholesterolemia[5] and chronic fatigue syndrome." (*Id.*).  Dr. Abdulla's examination revealed

no abnormalities in Plaintiff's thought content or thought process. (*Id.* at 170).  Bazile-Flake showed

normal memory and recall, her judgment was found to be good, she was cooperative, and

"concentrated and did cognitive testing well." (*Id.* at 170-71).  Finally, Dr. Abdulla reported that

Plaintiff "takes care of her  personal needs," and that she

> gets up after 11:00.  She washes, brushes and has coffee … watches TV most of the
> day.  She cleans when she feels like it.  For lunch she states that she goes  to
> McDonald's or French's everyday [sic].  She reads or takes a nap.  She rarely
> cooks.… She goes to sleep between 10:00 to 12:00.

(*Id.* at171).  Dr. Abdulla described Plaintiff's social activities in the  following way: "goes to

church, talks on the phone with her friends, visits family members, and goes out to eat with her

children." (*Id.*).  She told Dr. Abdulla that she had driven herself to the appointment. (Tr. at 168).

Dr. Abdulla diagnosed Plaintiff as suffering from "[d]epression, [n]ot [o]therwise [s]pecified," due

to "feeling sad because of her symptoms" and her inability to continue to work. (Tr. at 171).

Further, Dr. Abdulla found that the depression she diagnosed resulted in "impairment in social,

occupational, and important areas of functioning," although her prognosis for Bazile-Flake was

"fair," and she assigned her a GAF score of 68. (*Id.*).

In March 2002, Dr. Jan Moeller completed a residual functional capacity assessment report,

following a review of Bazile-Flake's available medical records. (Tr. at 188).  In that report, Dr.

Moeller listed Plaintiff's "primary diagnosis" as fibromyalgia, and determined, from the information

he reviewed, that Plaintiff could lift items weighing up to 50 pounds, occasionally, and could lift

those weighing up to 25 pounds on a frequent basis. (Tr. at 189).  Dr. Moeller concluded  that

Plaintiff could stand, walk, or sit for about six hours in an eight hour workday, and that she had no

postural, manipulative, or visual limitations. (Tr. at 189-90).  Again, from his review of the records,

---

[5] "A condition in which greater than normal amounts of cholesterol are present in the blood."  *Id.* at 789.

Dr. Moeller reported that "[t]he alleged limitations caused by the client symptoms are not fully supported by the medical [and] other evidence." (Tr. at 193).  There is no indication in the record of what, if any,  medical specialty Dr. Moeller is schooled in.

In March 2002, Dr. Lyman G. Phillips  prepared a psychiatric review of Bazile-Flake, which was also drawn entirely from his reading of the medical records.  (Tr. at 174).  He noted that the evaluation was in reference to an "affective disorder," and he ultimately determined that  Bazile-Flake was suffering from a  non-specific depression.  (Tr. at 177).   He concluded further that her condition imposed  only "mild physical limitations" on her " activities of daily living."  (Tr. at 184). Dr. Phillips ended his assessment with the finding  that "[t]he alleged limitations caused by the client's symptoms are not fully supported by the med[ical and] other evidence."  (Tr. at 186).  Yet another psychiatric review was provided to the SSA in June 2002.  (Tr. at 196).  That report, prepared by Dr. Farrell Hillman,  was also based on the medical records only, and in it, he acknowledged Plaintiff's diagnosis of depression, and echoed the conclusion that she  is limited by mild "restriction of activities of daily living."  (Tr. at 199, 206).   He also found that she had mild difficulties in maintaining "social relationships" and  mild limitations in regard to "concentration, persistence or pace."  (Tr. at 206).   From his review of the records,  Dr. Hillman found that Plaintiff had "good memory concentration," and he  pointed to her statement that she "does household chores, watches TV, talks on phone, attends church, eats fast food," and "drives" as support for his conclusions. (Tr. at 208).

On April 12, 2002, Dr. Patricia Salvato sent a letter to the SSA, in which she described Bazile-Flake's symptoms and the resulting  limitations.  (Tr. at 109).  In her letter, Dr. Salvato reported that  she had diagnosed Plaintiff as suffering from "[f]ibromyalgia, [c]hronic [f]atigue [s]yndrome and Epstein-Barr virus," and that these impairments limited Plaintiff in the following ways:

[P]rolonged sitting, standing, and walking, understanding, remembering and following even simple instructions, interacting with others and maintaining a satisfactory work presence…. Although she can occasionally lift/carry 0-10 pounds, bend stoop, and crouch, she cannot perform these activities consistently or repetitively due to her muscle/joint pain and fatigue.

(*Id.*).  Dr. Salvato also stated that test results produced evidence of  "non-exudative pharyngitis,[6] tender/enlarged cervical lymph nodes, and low-grade fevers," and that Plaintiff's symptoms  met the "tender point criteria for [f]ibromyalgia."  (*Id.*).  Dr. Salvato wrote further, that in her opinion, Bazile-Flake's condition made it impossible for her to "withstand the physical and mental demands of job schedules and stressors."  (Tr. at 110).  She also reported that  Plaintiff cannot "maintain regular attendance on the job or be punctual within customary tolerances" and that her "cognitive dysfunction [would] limit[] her ability to functional professionally."  (*Id.*).

At the request of the DDS,  Dr. Salvato prepared a summary of Plaintiff's condition, which is dated October 2, 2002. (Tr. at 90).  In that summary, she again  reported that Bazile-Flake suffered from "[c]hronic [f]atigue [s]yndrome, fibromyalgia, [and] chronic Epstien-barr virus."  (Tr. at 91).  Dr. Salvato advised the state agency that Plaintiff's pain and fatigue preclude even sedentary work.  (*Id.*).  She commented  that these symptoms interfere with Bazile-Flake's ability to sustain attention and concentration, and make her  unable to  tolerate the stress of a full time job.  (Tr. at 91).  She also observed that Bazile-Flake's fatigue was "usually made worse by physical exercise," that it created "cognitive function problems," and that she suffered from secondary "depression."  (Tr. at 92).  Among the predictable cognitive function  problems that accompany Plaintiff's impairment, Dr. Salvato identified "attention deficit disorder" and "memory disturbance."  (*Id.*).  She also noted that Plaintiff suffered from other symptoms of CFS as well, including "sleep disturbance," "headaches," "numb[ness] or tingling feelings," and "chest pain." (*Id.*).  Dr. Salvato  detailed  Plaintiff's history

---

[6] "An inflammation or infection of the pharynx, usually causing symptoms of a sore throat."  *Mosby's Dictionary, Medical, Nursing, and Allied Health* 1251 (5th ed. 1998).

of "recurrent flu-like symptoms," "painful lymph nodes," and "muscle and joint aches with tender 'trigger points' of fibromyalgia." (*Id.*).

On May 16, 2003, Dr. Salvato prepared a second report for the SSA. In that report, her findings and opinions are consistent with her two earlier summaries of Plaintiff's condition and resulting limitations. (Tr. at 210-11).

### 3.  *Plaintiff's Educational Background, Work History and Present Age*

At the time of the administrative hearing, Plaintiff was 42 years old, she had completed high school, and had attended college for one semester. (Tr. at 233). She testified that she had worked for SBC as both a facility specialist and a customer service representative, and that she had been employed with that company for twenty-two years. (Tr. at 251).

### 4. *Subjective Complaints*

At the hearing before the ALJ, Plaintiff testified that she was "tired a lot," and that "I just don't have any, any energy**."** (Tr. at 238). She testified that she "might go to bed about two," and that she gets up "about 10 or 11." (Tr. at 240). She told the ALJ that, because of pain and fatigue, "my concentration and my memory is not what it used to be." (Tr. at 238). The ALJ then asked her, specifically, about her pain and other symptoms:

Q.  Well tell me how you feel on your worst day.  What's wrong with you on your worst day?
A.  A, a lot of pain and just - -
Q.  Where?
A.  Just - -
Q.  Pain?
A.  - - pain - -
Q.  Where?
A.  - - in my, in my shoulders, in my muscle, my joints and - -
Q.  All your joints?


A.  Probably not at the same time, It just - - well, I just be hurting.  And I get a, a numbness in my, in my arm.
Q.  Which arm?

18

A.  In my right arm.  And my, my fingers are - - and in my hands.
Q.  You're looking at your right hand now.
A.  Yeah, It's, it goes all down there.
Q.  Okay.  Your right hand goes numb?
A.  Um-hum.
Q.  How often does that happen?
A.  That happens a lot.
Q.  Well, I don't know what - -
A.  And - -
Q.  - - that means, so you're going to have to tell me.
A.  Probably about every other day, maybe.
Q.  For how long is it numb?
A.  Probably for - - I don't know.  Probably about an hour.  I don't know the, the time.
Q.  Okay. You have pain in your shoulders and in, in your joints.  You have numbness in you right arm, and your right hand goes numb every other day for an hour?
A.  Um-hum.

(Tr. at 236-38).  Bazile-Flake testified further that, "on a bad day," she spends the entire day "lying down," while on "good days" she has to rest for two or three hours.  (Tr. at 240-41). Plaintiff also stated that, "[o]n a good day, I might to try to vacuum the floor," or "try to wash dishes," but that she does no mopping, sweeping, or yard work.  (Tr. at 241-42).  She testified that, when she does try to vacuum, she gets "really tired," and "can sleep practically all day." (Tr. at 248).  As to her daily activities, she testified that "I watch TV.  I talk on the telephone," and that is "the majority of what I do."  (Tr. at 239).  "On a [sic] average day," she estimates that she talks on the telephone for "about three hours."  (Tr. at 240).  She stated that once or twice a month she goes to church and to visit her mother.  (Tr. at 243).  She reported that she drove to different places "about once a week."  (Tr. at 243).  She testified that she takes medication for anxiety, and that she "feel[s] better now."  (Tr. at 246).  She also stated that she suffers from shortness of breath, but "it's not like it was at first."  (*Id.*).  Bazile-Flake estimated that she could "probably" lift a gallon of milk in each hand; could walk for "about a half a block and back;" and could stand in one place for "about 10, 15 minutes."  (Tr. at 244-45).  But she told the ALJ that she could sit "a long time" without difficulty.  (Tr. at 245).

The ALJ then questioned Caroline Fisher, a vocational expert witness.  (Tr. at 249).  Fisher testified that she "could not find a DOT title" which matched Bazile-Flake's former job as a facility specialist.  However, she classified it as sedentary and skilled employment.  (Tr. at 249-50).  Further, she testified that, from Plaintiff's description of it at the hearing, her past work as a customer service representative could also be classified as sedentary and skilled.  (Tr. at 251).  The ALJ then posed the following hypothetical question to her:

> Assume for me a person the same age, educational and vocational… history as the Claimant.  Further assume that person has the following  limitations: Can lift and carry occasionally 20 pounds, lift and carry frequently 10 pounds; stand and walk in an eight hour day with normal breaks at least two hours; sit in an 8 hour day with normal breaks at least six hours; no climbing of ramps, ladders, or scaffolds, no crawling or stooping or kneeling; no working in extreme heat or cold or high humidity; no communication limitations; manipulative limitations would be a 20 percent reduction in fingering ability in the right hand.  With those limitations, could such a person be able to perform any of the past relevant work that the Claimant performed, either as she actually performed them or as customarily performed in the national economy.

(Tr. at 252).  Fisher answered that "[y]es, past work could be performed," including both of Plaintiff's previous jobs.  (*Id.*).  The ALJ then modified his hypothetical question to include the limitation "that this individual would be unable to work eight hours a day … or 40 hours a week.  Would those jobs still be available?" (Tr. at 252-53).  Fisher replied "[n]o," "that would preclude competitive employment."  (Tr. at 253).  Plaintiff's representative asked no questions of Fisher at the hearing.

**The ALJ's Decision**

On July 13, 2003, the ALJ issued a written decision denying Bazile-Flake's claim.  Based on the applicable legal principles, and his assessment of the evidence before him, he determined that Bazile-Flake suffers from chronic fatigue syndrome.  (Tr. at 13).  Although he determined that her condition is "severe," he concluded, ultimately, that it does not meet, or equal in severity, the medical criteria for any disabling physical impairments listed in the applicable Social Security Regulations.

(*Id.*).    In reaching his decision, the ALJ first considered the treatment records and opinions provided by Dr. Salvato, Plaintiff's treating physician.   He observed that Dr. Salvato's treatment notes were consistent with the diagnosis of CFS, and that they traced complaints of "headaches, shortness of breath, joint and muscle pain, persistent body aches, and tingling in [Plaintiff's] hands and fingers." (Tr. at 14).   He also cited Dr. Salvato's findings of "evidence of non-exudative pharyngitis, tender and enlarged cervical lymph nodes, and low grade fevers."   (*Id.*).   On the critical issue of Dr. Salvato's opinion on Bazile-Flake's residual functional capacity, the ALJ made two noteworthy findings.   In  his written decision, he repeated the treating doctor's conclusion that Plaintiff was unable to work "even a full time work day," or deal with the stress of a full time job, and that her pain "would interfere with her concentration and attention."   (*Id.*).   He then found that Dr. Salvato's opinion matched Bazile-Flake's subjective complaints, but that the weight of her "assessment and medical opinions is diminished because they are in conflict with the objective medical findings." (*Id.*). The ALJ specifically incorporated Dr. Ana Blackmon's findings that, from her examination, Plaintiff

> exhibits full range of motion in all joints, [with] no signs of edema, swelling, or joint deformity … [T]he claimant has no signs of muscle atrophy or weakness, and her motor strength is described as 5/5, which is normal.  No neurological or sensory deficits were noted…The claimant's gait and station was not impaired, and there was no evidence of any disturbance in her upper or lower extremities or her back.

(Tr. at 13-14).  He also pointed to Dr. Abdulla's findings that Bazile-Flake showed "normal memory and recall," "good" judgment,  and "no signs of any cognitive or concentration deficits."  (Tr. at 14). The ALJ concluded that, because Dr. Salvato's opinion "conflicted" with those from Dr. Blackmon and Dr. Abdulla, and was not based on clinical findings, it was "not entitled to significant probative weight."  (Tr. at 15). He chose instead to rely on the examining physicians' opinions to determine Plaintiff's residual functional capacity.  (*Id.*).

The ALJ  then addressed Plaintiff's subjective complaints of pain, weakness, and fatigue, which he summarized, as follows:

> The claimant testified that she could no longer work due to significant pain and fatigue.  She alleged that she has numbness in her right arm, hand and fingers and is tired all the time.  The claimant further alleged that her concentration and memory or [sic] poor due to her pain and fatigue.  She stated that she must rest frequently even on her "good" days for two or three hours, and that she must lay down the entire day on her "bad" days.  The claimant testified that she could not over exert herself, and alleged that she could not walk for more than three minutes or stand more than 10 or 15 minutes.  She acknowledged that she could sit without difficulty.

(Tr. at 14).  The ALJ conceded that, if he accepted all of Plaintiff's complaints as true, she would be deemed disabled.  He found, however, that her "allegations conflict with other evidence of record" and so "some, but not all" of her "subjective restrictions" were accepted as "credible."  (*Id.*).  He pointed out that Bazile-Flake's testimony was "inconsistent and conflicts with other evidence of record, including her own previous statements to others."  (Tr. at 15).  The only example of this conflict that he cited, however, was her complaint of numbness in her right hand and arm.  He then remarked that such numbness was not "noted on clinical examination," and so he found her credibility lacking.  (*Id.*).  Further, the ALJ pointed out that "[d]espite her allegations of weakness and fatigue and persistent body aches, [Plaintiff] does not exhibit any signs of muscle loss, atrophy, or weakness."  (*Id.*).  He noted that, while Bazile-Flake claimed she had difficulty in "concentrating and attending to tasks," she **"**acknowledged" that "she had no difficulty following TV shows,"and, that Dr. Abdulla  found "no deficiencies" in her memory, concentration, or attention.  (*Id.*).  Finally, he commented that if Plaintiff's "symptoms  were as debilitating as alleged," they would have been apparent at the independent medical exams.  Because "they did not appear at those examinations" it "diminishes the claimant's overall credibility."  (*Id.*).  He then decided to give greater weight to the "objective medical evidence" in determining Plaintiff's ability to work.  (*Id.*).

That "objective" evidence convinced the ALJ that Plaintiff retained the functional capacity "for a wide range of work at the sedentary level." (Tr. at 16). From Dr. Blackmon's report, he determined that she could "lift up to 10 pounds frequently and 20 pounds occasionally, sit up to six hours in a work day and could stand and walk no more than two hours in a work day." (*Id.*). The ALJ allowed for a "20 percent reduction in the frequency of use in her right hand." (*Id.*). He found that Plaintiff had no mental limitations, explicitly rejecting Dr. Salvato's "assessment from May 2003, because it is unsupported by clinical evidence and [is] inconsistent with medical findings from other sources." (*Id.*). The ALJ also based his decision, in part, on the testimony from Ms. Fisher, who stated that Plaintiff's previous employment could accommodate the limitations he found credible. (*Id.*). With that, the ALJ concluded that Bazile-Flake can "perform her past relevant work as a Facility Specialist or as a Customer Representative," that she was "not under a 'disability' as defined in the Social Security Act," and he denied her claim for benefits. (Tr. at 16).

**Plaintiff's Contentions**

Before this court, Bazile-Flake complains that the ALJ erred in evaluating the evidence and testimony presented at the hearing. Plaintiff argues, at the outset, that SSA policy opposes rejecting a diagnosis of CFS if there is sufficient evidence of relevant symptoms to support it. (Plaintiff's Brief at 10). While Plaintiff concedes that the ALJ did find that she suffers from CFS, and that it is a severe impairment for her, she complains that he did not discuss its properties, or the regulation that pertains to it. Bazile-Flake points to S.S.R. 99-2p, which details the process by which any CFS impairment should be evaluated for Social Security purposes. S.S.R. 99-2p, 1996 WL 271569 (S.S.A.), at *1. Within that particular regulation, CFS is defined as "a systemic disorder consisting of a complex of symptoms that may vary in incidence, duration, and severity." (*Id.*). Clearly, the ALJ here found that the medical evidence supported Plaintiff's medically determinable CFS, and he then proceeded with the customary five-step sequential analysis to determine whether she is rendered

disabled by that impairment.  (Tr. at 13-14).  While it is true that he did not specifically mention S.S.R. 99-2p, or recite the steps taken in evaluating Plaintiff's claim, that is not, in itself, grounds for a remand.  Plaintiff is required to show some prejudice from an ALJ's failure to follow the applicable regulation before a ruling need be set aside.  *Hall v. Schweiker*, 660 F.2d 116, 119 (5th Cir. 1981).

### Weight Given to Treating Physician's Opinions

Plaintiff's overarching complaint is that the ALJ improperly discounted or rejected the opinions and evidence from her treating physician, Dr. Salvato.  (Plaintiff's Brief at 19).  She claims that, in doing so, he did not adequately explain his reason for not giving that evidence controlling weight, as the SSA regulations demand.  Instead, he opted to credit Dr. Blackmon's findings, and decided the disability issue on factors which are irrelevant to CFS.  (*Id.* at 20).  Bazile-Flake insists that Dr. Blackmon's findings cannot confirm or rule out CFS, or fibromyalgia, because the testing done, and the observations made, were not relevant to either of those conditions.  (*Id.*).  Plaintiff also complains that the ALJ erred because he did not seek clarification from Dr. Salvato before he rejected her findings.  (*Id.* at 19).  Defendant responds, however, that the ALJ properly discounted Dr. Salvato's opinions because they were not supported by specific medical findings.  (Defendant's Memorandum at 4-5, 9-10).  Further, she argues that the ALJ was not required to seek clarification from Dr. Salvato because there was objective medical evidence to demonstrate that Bazile-Flake was not disabled.  (*Id.* at 11).

It is true that the SSA regulations require the Commissioner to evaluate every medical opinion received in evidence on a claimant's behalf.  20 C.F.R. § 404.1527(d).  It is also true that, generally, more weight is given to an opinion from a treating physician than to those given by other medical professionals, including examining physicians and medical expert witnesses.  *Myers v. Apfel*, 238 F.3d 617, 621 (5th Cir. 2001); *Loza v. Apfel*, 219 F.3d 378, 381, 354 (5th Cir. 2000); *Greenspan v. Shalala*, 38 F.3d 232, 237 (5th Cir. 1994); 20 C.F.R. § 404.1527(d)(2).  On that matter, the Fifth

Circuit "has repeatedly held that ordinarily the opinions, diagnoses and medical evidence of a treating physician who is familiar with the claimant's injuries, treatment, and responses should be accorded considerable weight in determining disability." *Loza*, 219 F.3d at 395; *see also Myers*, 238 F.3d at 621; *Greenspan*, 38 F.3d at 237. However, "[t]he ALJ may give less weight to a treating physician's opinion when 'there is good cause'" to do so. *Loza*, 219 F.3d at 395 (quoting *Scott v. Heckler*, 770 F.2d 482, 485 (5th Cir. 1985)); *see also Myers*, 238 F.3d at 621; *Newton*, 209 F.3d at 455-56; *Greenspan*, 38 F.3d at 237. "Good cause" may exist when the treating physician's statements are "brief and conclusory, not supported by medically acceptable clinical laboratory diagnostic techniques, or otherwise unsupported by the evidence." *Myers*, 238 F.3d at 621; *Greenspan*, 38 F.3d at 237; *see also Newton*, 209 F.3d at 456. But Fifth Circuit precedent is equally clear that

> A finding that a treating source medical opinion is not well supported by medically acceptable clinical and laboratory diagnostic techniques or is inconsistent with the other substantial evidence in the case record means only that the opinion is not entitled to "controlling weight," not that the opinion should be rejected. *Treating source medical opinions are still entitled to deference and must be weighed using all of the factors provided in 20 C.F.R. § 404.1527 and 416.927.* In many cases, a treating source's medical opinion will be entitled to the greatest weight and should be adopted even if it does not meet the test for controlling weight.

*Newton*, 209 F.3d at 456 (quoting SSR 96-2p). Further, if the ALJ does show

> that the treating physician's records are inconclusive or otherwise inadequate to receive controlling weight, absent other medical opinion evidence based on personal examination or treatment of the claimant, the ALJ must seek clarification or additional evidence from the treating physician in accordance with 20 C.F.R. § 404.1512(e).

*Newton*, 209 F.3d at 453. That regulation provides that a treating physician's records are considered "inconclusive" if they "contain[] a conflict or ambiguity that must be resolved"; if they do "not contain all the necessary information"; or if they do "not appear to be based on medically acceptable clinical and laboratory techniques." *Id*. at 457 (quoting 20 C.F.R. § 404.1512(e)(1)). The duty to contact treating doctors for clarification is critical because, in determining whether a disability exists, the ALJ "owe[s] a duty to a claimant to develop the record fully and fairly to ensure that his decision

is an informed decision based on sufficient facts." *Brock*, 84 F.3d at 728. "If the ALJ does not satisfy his duty, his decision is not substantially justified." *Newton*, 209 F.3d at 458 (quoting *Ripley v. Chater*, 67 F.3d 552, 557 (5th Cir. 1995).

Here, the ALJ gave less than controlling weight to Dr. Salvato's opinions, after concluding that "her assessment and opinions are not well-supported and materially conflict with other evidence of record." (Tr. at 15). The ALJ specifically contrasted Dr. Salvato's findings with those from Dr. Blackmon, which he recited in his decision. (Tr. at 14). He also relied on the observations Dr. Abdulla made in her psychiatric evaluation, that Plaintiff exhibited "normal memory and recall," good judgment and "no signs of any cognitive or concentration deficits." (*Id.*). The ALJ then reasoned that Dr. Salvato's opinion on Plaintiff's physical and mental limitations conflicted with the others and so it was not entitled to significant weight. (Tr. at 15). By one measure, the ALJ's decision on the weight to give Dr. Salvato's opinion, and the process by which he arrived at that decision, is easily understood, and, arguably, may technically comport with the SSA regulations and guidelines. On the other hand, as Plaintiff points out, this decision skirts the nature of her actual complaints. To note that objective testing at one examination reveals an ability to lift ten pound items on a frequent basis or to walk or stand for a given length of time does not really inform the issue of what Bazile-Flake is "still able to do" in terms of gainful employment, given her severe impairment, CFS. (Tr. at 16). What a claimant is actually able to do is the fundamental inquiry in determining residual functional capacity. S.S.R. 86-8, 1986 WL 68636 (S.S.A.) at *5. As Plaintiff argues throughout, the SSA's own guidelines speak to this impairment as a "complex of symptoms," which can include the following:

> Self-reported impairment in short-term memory or concentration severe enough to cause substantial reduction in previous levels of occupational, educational, social or personal activities;
> Tender cervical or axillary lymph nodes;
> Muscle pain;

26

> Multi-joint pain without joint swelling or redness;
> Headaches of a new type, pattern, or severity;
> Unrefreshing sleep; and
> Postexertional malaise lasting more than 24 hours.

(S.S.R. 99-2p, 1999 WL 271569 (S.S.A.)  at *2.  And, CFS can trigger other symptoms, such as

> muscle weakness, swollen underarm [] glands, sleep disturbances, visual difficulties (trouble focusing or severe photosensitivity), orthostatic intolerance (e.g., lightheadedness or increased fatigue with prolonged standing), other neurocognitive problems (e.g., difficultly comprehending and processing information), fainting, dizziness, and mental problems (e.g., depression, irritability, anxiety).

(*Id.*).  At some point, reality must intrude on the routine disability determination process.  Given this "complex of symptoms" it may be questionable whether CFS is likely to produce limitations that are either strictly "exertional" or strictly "non-exertional."  Limitations pertinent to these two categories are essential to a typical disability decision, which is usually informed by reference to the "objective clinical data."  S.S.R. 86-8, at *5.  But aspects of both of these categories of limitations may be predictable in the symptoms and effects of CFS.  *See, e.g., Karvelis v. Reliance Standard Life Ins. Co.*, 2005 WL 1801943 (S. D. Tex. 2005).  And, more importantly, the melding of these categories may not lend those symptoms or effects to fit neatly within the "objective testing" criteria which are routinely used to reach a concrete disability finding.

Certainly, it is arguable whether a number of Dr. Blackmon's findings really speak to symptoms of CFS.  For example, Plaintiff's range of motion or the absence of a gait disturbance are not indicative of whether she is limited by any of the predictable symptoms attendant to that impairment.  Nor does an ability to lift a certain amount of weight or the absence of back pain on a particular day show that Bazile-Flake does not suffer the level of fatigue she alleges.  Notably, Dr. Blackmon did no tender point exam to determine if Plaintiff also suffered from fibromyalgia, as her treating physician has suggested.  (Tr. at 162-65).  While the court recognizes that the burden to establish an impairment always remains with Bazile-Flake, and that the ALJ was not required to

become her advocate, he does owe her the duty to investigate *her* claim, not whatever condition the examining physician was addressing outside the context of her impairment.  *Milam v. Bowen*, 782 F.2d 1284 (5th Cir. 1986).  In this case, the ALJ relied on information that may have little relevance to whether Plaintiff can return to her prior work.  And, beyond merely relying on it,  he found that evidence  more "credible" than the assessment by Plaintiff's own doctor who had been treating her for years.  Surely, further information from the treating physician, or any medical expert witness for that matter, could have clarified whether Dr. Salvato's findings actually do conflict with the "objective" evidence that the ALJ found more persuasive, or whether the impairment itself resulted in legitimate limitations that do not quite mesh with the objective testing that was done.  If the latter, then the record reflects not a conflict, but an "ambiguity" in the medical evidence that requires exploration.  *Newton*, 209 F.3d at 457.

On that point, it is also significant that the ALJ  noted  that Dr. Blackmon found no "signs of muscle loss, atrophy, or weakness," and surmised that "if [Plaintiff's] symptoms were as debilitating as alleged, a reasonable person would have expected her limitations to be detected during the independent medical examinations." (Tr. at 15).  From this passage, it is apparent that the ALJ came to his own conclusion about the value and meaning of that clinical finding.  While he may have reached the right conclusion on the importance of that data, he has no basis in the evidence to support it.  Further, language similar to this finding has been disapproved by the Fifth Circuit in an earlier decision.  In fact, the Fifth Circuit echoed the Seventh Circuit's warning against ALJs "'playing doctor' and making their own independent medical assessments."  *Frank v. Barnhart*, 326 F.3d 618, 622 (5th Cir. 2003).  As the court underscored in *Frank*, the necessity for an ALJ to seek expert guidance on medical issues is essential because, "'[c]ommon sense can mislead; lay intuitions about medical phenomena are often wrong.'"  *Id*. (quoting *Schmidt v. Sullivan*, 914 F.2d 117, 118 (7th Cir. 1990).  In *Frank*, the disability finding was not disturbed because the ALJ in that case was said to

28

have relied "very little" on his own assessment of the medical evidence.  *Id.*  Here, however, it is one

of the bases on which the ALJ gave diminished weight to the treating physician's opinion.  This ALJ

devised his own assessment of the medical importance of muscle atrophy in weighing the evidence

on Plaintiff's claims.  That he did so in lieu of contacting her treating physician or other expert for

clarification or additional evidence, calls into question whether "good cause" existed for him to limit

the weight he gave to Dr. Salvato's opinions.  *Loza*, 219 F.3d at 395.

**Findings on Plaintiff's Credibility**

Further, the ALJ's threshold conclusion that "conflicts" existed between the medical opinions

from the treater and the examiner, when perhaps there were no conflicts on truly relevant factors,

compounded the difficulty in assessing Plaintiff's residual functional capacity ("RFC").  On that

point, Plaintiff argues that the ALJ erred because he failed to fairly consider whether the effects of

her pain, among other complaints, precludes employment.  (Plaintiff's Brief at 24).  And, because

the ALJ found her testimony to lack credibility on the grounds that no objective medical findings

supported her claims of pain, he created yet another impediment to an accurate assessment.

(Plaintiff's Brief at 23).  Finally, Plaintiff argues that, even if the ALJ was otherwise correct in

finding that she could still perform her old job, he erred when he failed to make any findings as to

her ability to sustain employment. *(Id.* at 25).

In this instance, the ALJ conceded that Plaintiff has a medically determinable impairment

that causes some pain and functional limitation.  (Tr. at 15).  But he found her testimony

"inconsistent" and not wholly credible. (*Id.*).  The ALJ determined that these inconsistencies, among

other cited "conflicts" in her testimony,  "diminishe[s] the claimant's overall credibility," and so he

gave greater weight to the objective medical evidence in deciding Plaintiff's ability to work.  (*Id.*).

Two problems arise immediately, however, from this approach to the evidence.  First, at least one

of the ALJ's references to a "conflict" in Plaintiff's testimony is misplaced.  While he concluded that

she was not credible  because she testified  that she regularly experienced numbness in her arm and hand, his conclusion stemmed from the absence of a similar "allegation" in Dr. Blackmon's report. (Tr. at 15).  A review of the record shows, however, that Bazile-Flake repeatedly complained of such numbness to her own doctor throughout the course of her treatment.  (Tr. at 99, 104, 111, 118, 136, 138).  In fact, on April 27, 2001, Plaintiff specifically complained of numbness in her "arms and hands," and on April 15, 2002, she reported that she had "heaviness/numbness in [the] arms."  (Tr. at 104, 138).  The same is true with regard to Plaintiff's  repeated complaints of memory loss, which are also reflected in Dr. Salvato's  records.  (Tr. at 93, 99, 104, 111, 118 ,132, 136, 138, 140).  For example, on October 26, 2001, Bazile-Flake complained to Dr. Salvato that she experienced a "loss of short term memory," and on October 2, 2002, she reported a loss of concentration and "ability to focus."  (Tr. at 93, 118).   The ALJ did not address this evidence before he found that her testimony was not credible.  This failure is significant because, after he discounted Plaintiff's credibility, he used that as a basis to also discredit her treating physician's opinions, as they merely "matched" Bazile-Flake's subjective complaints.  (Tr. at 14).

**Plaintiff's Residual Functional Capacity**

The second problem that arises from the ALJ's questionable credibility finding is the one at the core of Plaintiff's complaint.  By not giving controlling weight to Dr. Salvato's opinion that Plaintiff's CFS rendered her unable to return to work, the ALJ had to decide her RFC from the examiner's report alone.  Again, given the nature of CFS as an impairment, Plaintiff makes a persuasive argument that her actual residual functional capacity was not, and could not be, addressed in testing such as that administered by Dr. Blackmon.  (Plaintiff's Brief at 20).  In that regard, the SSA  regulations define an RFC

> As what an individual can still do despite his or her limitations.  RFC is an administrative assessment of the extent to which an individual's medically determinable impairment(s), including any related symptoms, such as pain, may cause

physical or mental limitations or restrictions that may affect his or her capacity to do work-related physical and mental activities.  Ordinarily, RFC is the individual's maximum remaining ability to do sustained work activities in an ordinary work setting on a regular and continuing basis, and the RFC assessment must include a discussion of the individual's abilities on that basis.  A "regular and continuing basis" means an 8 hour day, for 5 days a week, or an equivalent work schedule.  RFC does not represent the least an individual can do despite his or her limitations or restrictions, but the most.  RFC is assessed by adjudicators at each level of the administrative review process based on all of the relevant evidence in the case record, including information about the individual's symptoms and any "medical source statements" - - i.e., opinions about what the individual can still do despite his or her impairment(s) - - submitted by an individual's treating source or other acceptable medical sources.

S.S.R. 96-8p, 1996 WL 374184 (S.S.A.) at *2(footnotes omitted).  And, the law is clear that the ALJ must determine a claimant's residual functional capacity in light of any existing impairment.[7] *Ripley*, 67 F.3d at 557 (citing 20 C.F.R. § 404.1546).  To make this determination, the ALJ "must consider a claimant's subjective symptoms as well as objective medical evidence."  *Wingo v. Bowen*, 852 F.2d 827, 830 (5th Cir. 1988).  To establish whether such a disabling effect exists, an ALJ must consider the claimant's subjective complaints  "about the intensity, persistence, and limiting effects of [her] symptoms, and . . . will evaluate [her] statements in relation to the objective medical evidence and other evidence."  20 C.F.R. § 404.1529(c)(4); *and see Falco v. Shalala,* 27 F.3d 160, 163 (5th Cir. 1994).  Further, "since this is an important and, in some instances, a controlling issue, every effort should be made to secure evidence that resolves the issue clearly and explicitly."  S.S.R. 96-8 at *5.

Given the inherently broad range of symptoms and effects encompassed in an impairment such as CFS, an ALJ's duty to adhere to these regulatory admonitions is even more pronounced.  In such cases, the Commissioner must

---

[7] As the ALJ referenced in his decision, under S.S.R. 86-8,  "the RFC assessment is based primarily on the medical findings, i.e., the symptoms, signs, and laboratory results, which must be complete enough to permit and support the necessary judgments concerning the individual's physical, mental, and sensory capacities and any environmental restrictions.  Descriptions and observations of the claimant's restrictions by medical and nonmedical sources in addition to those made during formal medical examinations must also be considered in the determination of RFC."

consider all allegations of physical and mental limitations or restrictions and make every reasonable effort to ensure that the file contains sufficient evidence to assess RFC. Careful consideration must be given to any available information about symptoms because subjective descriptions may indicate more severe limitations or restrictions than can be shown by objective medical evidence alone.

S.S.R. 96-8p, 1996 WL 374184 (S.S.A.) at *5. On this record, the court is persuaded that the ALJ gave insufficient consideration to the interplay between Plaintiff's subjective complaints, which arise from her severe impairment of CFS, and her limitations, especially as they may elude a showing by "objective medical evidence alone." For that reason, her case must be remanded to allow the Commissioner to develop all of the evidence relevant to Plaintiff's impairment to better assess her actual residual functional capacity. Certainly a more thorough consideration of whether the opinions rendered by the treating sources are in conflict with other expert opinions or evidence will be critical in determining what Bazile-Flake is "actually able to do," given her impairment.

**Ability to Sustain Employment**

Plaintiff's final contention is that the ALJ erred when he failed to make findings on her ability to maintain employment, even if her RFC allowed her to return to her previous job. (Plaintiff's Brief at 24). She contends that the ALJ was required to demonstrate that, given her impairments, she is able to perform a full day's work. (*Id.*). In regard to this purported error, the Fifth Circuit addressed this issue almost twenty years ago in *Singletary v. Bowen*. 798 F.2d 818 (5th Cir. 1986). In that case, the court held that "a finding that a claimant is able to engage in substantial gainful activity requires more than a simple determination that the claimant can find employment and that he can physically perform certain jobs; it also requires a determination that the claimant can hold whatever job he finds for a significant period of time." *Id.* at 822; *accord Watson v. Barnhart*, 288 F.3d 212 (5th Cir. 2002) (extending holding in *Singletary* to cover physical impairments). The court later explained, however, that "nothing in [these cases] suggests that the ALJ must make a

specific finding regarding the claimant's ability to maintain employment in every case." *Frank v. Barnhart*, 326 F.3d 618, 619 (5th Cir. 2003).  Instead, such findings are required only in a situation in "which, by its nature, the claimant's physical ailment waxes and wanes in its manifestation of disabling symptoms."  *Id.*  In other words,

> [I]n order to support a finding of disability, the claimant's intermittently recurring symptoms must be of sufficient frequency or severity to prevent the claimant from holding a job for a significant period of time.  An ALJ may explore this factual predicate in connection with the claimant's physical diagnosis as well as in the ability-to-work determination.  Usually, the issue of whether the claimant can maintain employment for a significant period of time will be subsumed in the analysis regarding the claimant's ability to obtain employment.  Nevertheless, an occasion may arise, as in *Watson*, where the medical impairment, and the symptoms thereof, is of such a nature that  separate consideration of whether the claimant is capable of maintaining employment is required.

*Id.*  The same issue was later addressed in *Dunbar v. Barnhart*, and there, the court observed that,

> absent evidence that a claimant's ability to maintain employment would be compromised despite his ability to perform employment as an initial matter, or an indication that the ALJ did not appreciate that an ability to perform work on a regular and continuing basis is inherent in the definition of [residual functional capacity], we do not read *Watson* to require a specific finding that the claimant can maintain employment.

330 F.3d 670, 672 (5th Cir. 2003).

Here,  in  addition to Plaintiff's testimony that her condition has gone "up and down," it appears that CFS may be within that group of impairments that predictably "waxe[s] and wane[s]," in its disabling effects, so that such an inquiry is triggered.  (Tr. At 238).  *See Frank*, 326 F.3d at 619.  In fact, the ALJ's alternative hypothetical question to the  vocational  expert  witness demonstrated that, if Plaintiff's subjective complaints were fully credited, "competitive employment" is not available to her.  (Tr. at 252-53).  On this point, however, the record is not sufficiently developed to allow a proper  consideration of that issue.  From the present state of the evidence, it cannot be determined whether explicit findings on Bazile-Flake's ability to maintain

33

employment was required.  That evidentiary gap is inextricably linked to what her actual limitations are, and to  a valid assessment of her RFC once  those limitations have been identified. Those two factors, unfortunately, are in need of further development, and so, for that reason as well, this matter must be remanded to breach that critical gap.  Accordingly, it is recommended that Plaintiff's motion be GRANTED, that the claim be remanded, and that  Defendant's motion be DENIED.

**Conclusion**

Based on the foregoing, it is RECOMMENDED that  the  motion for summary judgment by Plaintiff Marcia D. Bazile-Flake be GRANTED, and that this  matter be remanded, under  the fourth sentence of  42 U.S.C. § 405(g), so that the administrative law judge may properly develop the record further, under the governing regulations, to reconcile any conflicts or ambiguities in the medical opinions, to determine Plaintiff's actual limitations and residual functional capacity, as well as, if necessary, her ability to maintain employment.  It is further RECOMMENDED that the motion by Social Security Commissioner Jo Anne B. Barnhart be DENIED.

The Clerk of the court shall send copies of this memorandum and recommendation to the respective parties who will then have until **March 23, 2006**, to file written objections, pursuant to 28 U.S.C. § 636(b)(1)(c), General Order 80-5, S.D. Texas.  Failure to file written objections within the time period provided will bar an aggrieved party from attacking the factual findings and legal conclusions on appeal.

The original of any written objections shall be filed with the United States District Clerk, P.O.

61010, Houston, Texas 77208; copies of any such objections shall be delivered to the chambers of

Judge Lee H. Rosenthal, Room 11535, **and** to the chambers of the undersigned, room 7007.

Signed at Houston, Texas, this <u>10th</u> day of March, 2006.

**MARY MILLOY**
**UNITED STATES MAGISTRATE JUDGE**